**Judith Van Zant GRONDIN, as personal representative of the Estate of Ronald Van Zant, Deceased, Plaintiff,**

**v.**

**Gary R. ROSSINGTON, Leon R. Wilkeson, William N. Powell, Artimus Pyle, Ed King, Randall Hall, Johnny Van Zant, Charlie Brusco, and MCA Records, Inc., Defendants.**

No. 88 Civ. 3192 (RWS).

United States District Court, S.D. New York.

June 9, 1988.

As Amended June 14, 1988.

Bender & Frankel, New York City (Sandor Frankel, of counsel), for plaintiff.

Jay Goldberg, P.C., Rossington, Wilkeson, Powell, Pyle, King, Hall, Van Zant, and Brusco, New York City (Jay Goldberg, of counsel), for defendants.

Franklin, Weinrib, Rudell & Vassallo, P.C., New York City (Neil J. Rosini, of counsel), for defendant MCA Records, Inc.

OPINION

SWEET, District Judge.

Plaintiff Judith Van Zant Grondin ("Grondin") has moved for a preliminary injunction pursuant to Rule 65, Fed.R. Civ.P., enjoining defendants Gary R. Rossington ("Rossington"), Leon R. Wilkeson ("Wilkeson"), William N. Powell ("Powell"), Artimus Pyle ("Pyle"), Ed King ("King"), Randal Hall ("Hall"), Johnny Van Zant ("Johnny"), and Charlie Brusco ("Brusco") from performing as a musical group under the name Lynyrd Skynyrd (the new group referred to herein as the "87–88 Skynyrd" or the "new band"), and enjoining defendant MCA Records, Inc. ("MCA") from marketing a record album entitled "Lynyrd Skynyrd Live" (the "album" or "Live"). For the reasons set forth below, preliminary relief will be granted in part and denied in part, and an early trial date will be set.

*Prior Proceedings*

Grondin filed this action on May 6, 1988. She seeks to enjoin use of the name Lynyrd Skynyrd by the new band both in performing and in record production as well as damages. She claims such use violates an agreement between Grondin and the individual defendants, causes consumer confusion under § 43(c) of the Lanham Act, 15 U.S.C. § 1125(a), constitutes injury to the business reputation of Lynyrd Skynyrd under N.Y. General Business Law § 368–d, and common law unfair competition and tortious interference with her contractual

rights. On May 13, 1988, she moved by way of order to show cause for a preliminary injunction to protect her rights under the agreement, under the Lanham Act, and under § 368–d's proscription of dilution. An evidentiary hearing was held on May 20–25, 1988 giving rise to the following facts and conclusions of law.

*Facts*

This controversy centers around the use of the name Lynyrd Skynyrd, the name of a rock and roll band that was quite popular in the 1970's,[1] to describe a current version of that group and to market the new band's record album. The plaintiff is the widow of Ronnie Van Zant ("Ronnie"), the mother of his children and the representative of his estate. The individual defendants are past and current members or affiliates of the new band. MCA is currently marketing the Live album.

The group Lynyrd Skynyrd was formed in the early 1970's. Its founding members were Ronnie and Rossington. The name Lynyrd Skynyrd was chosen as a spoof on the name of their highschool gym teacher and is pronounced Leonard Skinnerd. Soon after, Allen Collins ("Collins"), and defendants Wilkeson and Powell joined the band.

After several years of hard work Lynyrd Skynyrd began to achieve a reasonable amount of success, and by 1974, had entered into an exclusive artists recording agreement with MCA. By 1975, the group decided to form a corporation known as Lynyrd Skynyrd Productions, Inc. ("LSPI") to hold, among other things, all rights to the trade name, trade marks or service marks. The shareholders agreement setting forth these rights was dated September 15, 1975, and was signed by Rossington, Ronnie, Wilkeson, Powell, and Collins.

Over the course of the next two years, Lynyrd Skynyrd achieved great commercial success. The group, which by then included guitarist Steven Gaines, Pyle, and back-up singers. They had six record albums on the market by 1977 including an album recording live performances. The albums had sold millions of copies and the band had toured the country, performing in various cities. However, on October 20, 1977, while on tour, the plane in which the group was flying ran out of gas, crashed and Ronnie, Gaines and two others were killed. According to all parties, the survivors were physically and emotionally devastated.

A few months after the crash, Grondin—Ronnie's personal representative and beneficiary—Rossington, Collins, and the widow of Steven Gaines, now Teresa Gaines Rapp ("Rapp") were present in Grondin's home. At that time Grondin, Rossington and Collins agreed orally never to use the name Lynyrd Skynyrd again in an effort not to capitalize on the tragedy that had befallen the group. According to Grondin's testimony, that agreement (the "non-use agreement" or "blood oath") was restated on several occasions.

The blood oath was memorialized in several forms. First, it is in writing in the corporate minutes of a March 14, 1978 LSPI shareholders' meeting. Grondin, as a shareholder, was present at that meeting. A written agreement reflecting the nonuse agreement was signed simultaneously. That agreement purported to be a modification of the September 15, 1975 shareholders' agreement. It restricted the use of the name Lynyrd Skynyrd to material produced with Ronnie before his death.

For the ten years following the crash, the non-use agreement was observed by all concerned. The individual defendants continued to perform but did so under other names and with only limited success. For example, Rossington and Collins at one point formed the Rossington–Collins band.[2] Grondin was solicited by various book and film producers to consent to and sell the rights to projects regarding her husband's life and death but rejected them. However, during this period materials recorded by Lynyrd Skynyrd prior to the crash were

---

1. From here forward when the name Lynyrd Skynyrd is used in this opinion it is meant to refer to the band as it existed before October 20, 1977, inclusive of members Ronnie Van Zant and Steven Gaines.

2. Collins was later incapacitated by an automobile accident and no longer performs. He is not a party to this law suit.

continually released yielding profits for all involved. The materials consisted of three albums that Grondin was aware of and consented to and one compilation of previously released material put out by MCA of which she was unaware. During this period Grondin and Rapp remarried, Grondin to another musician.

After hotly debating the subject, on September 1, 1987, the survivors of the crash, along with Grondin, elected to conduct a tribute tour to Lynyrd Skynyrd.[3] An agreement was entered into whereby LSPI would form a corporation known as "The Tribute, Inc." ("Tribute") and would enter into a licensing agreement with Tribute allowing it to conduct a tour to be completed by December 31, 1987, produce videos of the tour, sell merchandise in connection with the tour, and produce a live album of the tour ("Tribute Agreement"). An accompanying agreement ("Licensing Agreement") actually giving Tribute license to perform the above mentioned acts, including a license to use the name Lynyrd Skynyrd, was entered into simultaneously. Grondin and Rapp, who were to receive 28.57% of the net proceeds from merchandising, were signatories to the Tribute Agreement, but not to the Licensing Agreement which was executed by LSPI. Both agreements contain clauses stating that nothing in the agreement constitutes a waiver of rights relative to the name Lynyrd Skynyrd. On October 1, 1987, Tribute entered into an agreement with MCA, authorizing MCA to produce an album from tour performances.

According to Grondin's testimony, she agreed to the tour under pressure and after rejecting various drafts of the agreement. She testified that the rejected drafts expressly referred to the touring band as Lynyrd Skynyrd. Grondin claims not to have permitted use of the name Lynyrd Skynyrd for the new band. Moreover, according to her testimony, any proceeds she was to receive from merchandising were already due her under a 1982 agreement.

The concerts took place in the fall of 1987. The 1987 tour ran from September 23, 1987 through November 1 of that year, and covered twenty-nine cities. The tour was conducted as a tribute to Lynyrd Skynyrd. Lacy Van Zant, the father of Ronnie and Johnny, began each show by introducing himself as the father of these men and by introducing the band. References to those killed in the crash are made throughout the show, particularly by Johnny, and videos of past performances with the late band members are displayed on a screen behind the musicians.

The record was produced from those performances. The final product is entitled, "Lynyrd Skynyrd Live." These words appear in large, bold, bright blue lettering across the top of the jacket, and they are outlined in white. They stand out starkly against a dark background depicting a concert audience waiving a confederate flag. At the bottom of the jacket front in much smaller, muted gold lettering are the words "Lynyrd Skynyrd Tribute Tour 1987." On the jacket back in red lettering are the words "Southern By The Grace of God." This latter title also appears on the spine of the album. Grondin did not approve the jacket design or the album's title. She testified that she learned of it by reading various trade publications in March 1988 and by seeing it in a record store.

Grondin testified that she first learned of the 1988 tour in February of that year, when she was contacted by an attorney for Powell. She was told that the tour was intended to promote the live album. She did not at that time consent to the tour. She testified that soon thereafter she spoke with Allen Collins expressing her displeasure with the impending concerts. Collins agreed to complain to Rossington about the tour and to thus halt its progress. By April, Grondin testified that she had been contacted by Larkin Collins, Allen's father, who claimed that Rossington had agreed to

---

**3.** Defendant Ed King had joined the band as it existed before the crash for a few albums and then left. He rejoined for the tour that is the subject of this suit. Defendants Hall and John- ny joined the 87–88 Skynyrd and were not members of the original band. Defendant Brusco is the new band's tour director.

Allen's demands and had cancelled the tour.

From Ronnie's death through April 1988, Grondin had been a 20% shareholder in LSPI, as well as a director. She essentially stood in Ronnie's shoes. In that month she received notice of a special shareholders meeting. The notice includes the statement:

> Following the special meeting of the stockholders, the persons elected to the board of directors will meet to discuss plans for the continuation of the tribute concert tour and will take all appropriate corporate action related thereto.

That, Grondin testified, was the first she had heard of the tour since Larkin Collins' claim that it had been cancelled.

On April 21, 1988, Grondin attended the meeting. At that time she was ousted from the corporation. By-laws, which had never before existed, were introduced. In fact, the corporation existed rather informally, there having been only two previous meetings since the crash, the March 1978 meeting and a 1982 meeting regarding merchandise. After failing to reach agreements on the tour and the album, the corporation voted to remove Grondin as a director and to take her stock. Grondin is still a shareholder of Tribute. However, she has not received any financial information regarding that concern.

The 1988 tour, which defendants claim is similar in format to the 1987 tour, began on May 10, 1988. It is to run through July 4, 1988 and cover thirty-six cities and a second leg of the tour is to commence August 4, 1988 and end September 15, 1988. The tour is presently underway.

*Conclusions*

The standard for granting a preliminary injunction in this Circuit is 1) irreparable injury and 2) either (a) a likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping in favor of the movant. *Jackson Dairy, Inc. v. H.P. Hood & Sons*, 596 F.2d 70, 72 (2d Cir.1979). In this case, Grondin has established irreparable injury and will probably succeed on the merits. She thus may win permanent injunctive relief. However, her injury is abated by the fact that she delayed in seeking relief regarding the tour, and thus the individual defendants may continue to conduct the tour that is already under way. Nevertheless, limited injunctive relief will be granted with respect to the album.

Grondin claims that she will be irreparably injured as a result of the tours' continuance and the album's distribution. Her claim first is that she had a valid non-use agreement through which she sought to protect her late husband's memory and Lynyrd Skynyrd's reputation. Moreover, she claims that even if she was not able to contract successfully to protect the Lynyrd Skynyrd name, the Lanham Act provides her with a remedy by prohibiting the use of a protected mark in such a way as to cause consumer confusion.

Indeed, if in this case confusion or a valid contract can be shown, irreparable injury follows. The number of consumers who would attend a concert of the 87–88 Lynyrd Skynyrd and thereafter would be less inclined to purchase previously released Lynyrd Skynyrd albums is incalculable. Also incalculable is the number of consumers who would purchase the Live album under the impression they were purchasing previously released material, or who would be less inclined to purchase old Lynyrd Skynyrd materials based on their impression of the Live album. Additionally, to the extent Grondin entered into a contract motivated by the desire to preserve her husband's memory, her emotional damages are difficult to quantify. A review of the merits clarifies the issue of injury.

*The Non–Use Agreement*

Grondin testified that she was a party, along with Rossington and Collins, to an oral non-use agreement entered into several months after the October 1977 plane crash. Her testimony was corroborated by Rapp, who was present when the original blood oath was entered into, and by others who claim to have heard the agreement restated by the defendants on other occasions. None of the defendants who were present when the oath was taken have de-

nied that the agreement existed. They merely contest the contract's enforceability. Thus, Grondin's testimony as to the existence of the agreement is credible and this court holds that the agreement did, in fact, exist.

■ The defendants contest the enforceability of the blood oath on the ground that it contravenes the statute of frauds. Whether the agreement satisfies the statute of frauds is a question of Florida law. The oral agreement was concluded in Grondin's home in that state, and the band was based there at the time of the crash. Thus, Florida has the most significant contacts with that agreement.

Under Florida's statute of frauds,

> No action shall be brought ... upon any agreement that is not to be performed within the space of 1 year from the making thereof ... unless the agreement or promise upon which such action shall be brought, or some note or memorandum thereof shall be in writing and signed by the party to be charged therewith or by some other person by him thereto lawfully authorized.

Fla.Stat. § 725.01 (1986). The defendants claim that the agreement was not to be performed within one year and hence that this statute applies.

To determine whether an agreement without an express termination date is to be performed within one year, the court, under Florida law, must look to the intent of the parties. *See Khawly v. Reboul,* 488 So.2d 856 (Fla.Dist.Ct.App.1986). As the Florida Supreme Court stated:

> when no time is agreed on for the complete performance of the contract, if from the object to be accomplished by it and the surrounding circumstances, it clearly appears that the party intended that it should extend for a longer period than a year, it is within the statute of frauds, though it cannot be said that there is any impossibility preventing its performance within a year.

*Yates v. Ball,* 132 Fla. 132, 181 So. 341 (1937), *quoted in Khawly, supra.*

The oral agreement entered into by Grondin, Rossington and Collins falls within this category. Each of the parties agreed to refrain from capitalizing on the Lynyrd Skynyrd name in return for a promise that no other member would so capitalize. While it is possible that the agreement could have lasted for under a year, if for example the parties were to die within that time frame, they plainly intended the blood oath to last perpetually.[4] Thus, the blood oath, covered by the statute of frauds by virtue of its intended time frame, is only enforceable if it is subject to one of the exceptions to the statute.

■ An agreement that has been performed will be taken out of the statute of frauds. Thus, if one party fully performs, a writing is no longer necessary. *See Hiatt v. Vaughn,* 430 So.2d 597 (Fla.Dist. Ct.App.1983). Similarly, the equitable doctrine of part performance will take an agreement out of the statute of frauds if the performance is induced by the contract only and if failure to enforce the contract would result in a hardship to the plaintiff. *See, e.g., Crossman v. Fontainbleau Hotel Corp.,* 273 F.2d 720, 724 (5th Cir.1959) (in lease context, when plaintiff has partially performed his share of the bargain, the contract will be enforced); *Poinciana Properties, Ltd. v. Englander Triangle, Inc.,* 437 So.2d 214 (Fla.Dist.Ct.App.1983) (same); *Rowland v. Ewell,* 174 So.2d 78 (Fla.Dist.Ct.App.1965) (disallowing recovery for oral employment agreement for term longer than one year when duties would have been performed in any event under week to week salary arrangement, but setting forth examples of when part performance will take agreement out of the statute); *cf. Rozema v. Wilson,* 419 So.2d 1139 n. 2 (Fla.Dist.Ct.App.1982) (acknowledging doctrine of part performance in context of horse breeding but holding it inapplicable to the case in issue due to disagreement regarding timing of performance).

---

**4.** *But see Schenkel v. Atlantic National Bank of Jacksonville,* 141 So.2d 327 (Fla.Dist.Ct.App. 1962) (contract terminable by death constitutes contract that could be terminated within one year and hence falls outside of statute of frauds).

*See generally* Corbin, On Contracts § 459 (1950) (setting forth doctrine of part performance under statute of frauds).

In this case, all parties had performed the agreement for the ten years succeeding the crash. The individual defendants had pursued musical careers under other names, and Grondin had rejected book and film contracts on Lynyrd Skynyrd and her late husband. Although it cannot be said that any party has fully performed due to the perpetual nature of the contract, part performance over the course of ten years is nearly as compelling. The statute of frauds is intended to prevent loose verbal statements or innuendos from binding a party and is thus intended to prevent fraud. *Tanenbaum v. Biscayne Osteopathic Hospital, Inc.,* 190 So.2d 777 (Fla. 1966) (citing *Yates, supra*). Where both parties to an agreement perform as though bound for ten years, the likelihood of fraud based on enforcement is scarcely a threat.

Moreover, Grondin performed as though bound for ten years believing she had a pact to protect the name of the band that included Ronnie. Had the agreement not existed and had the name Lynyrd Skynyrd been used to market music and music related merchandise, there would have been no point to her refusing book and movie deals; the name already would have been exploited. Ten years later, however, there may not be sufficient interest in the subject matter of the band and its demise to capture like literary and theatrical offers. Additionally, Grondin claims that the purpose of this contract was to hold inviolable the memory of the band that included Ronnie Van Zant. This, combined with Grondin's substantial part performance, compels equitable enforcement of the contract.

■ Another means of taking an agreement out of the statute of frauds is by producing a writing or memorandum signed by the party to be charged. Fla. Stat. § 725.01. In this case, the non-use agreement was memorialized in the minutes of the March 14, 1978 LSPI shareholder's meeting, at which Grondin was present

as a shareholder, and in the simultaneously executed modification of the September 15, 1975 shareholders agreement. The minutes have a space for endorsement by the secretary and approval by the chairman, here Rossington and Collins respectively, however the copy provided the court was not so endorsed. Nonetheless, the simultaneously executed agreement was signed by three of the parties to be charged in this case, Rossington, Wilkeson and Powell, along with Collins.

■ The defendants admit the validity of the March 14 agreement but deny that Grondin was either party to it or beneficiary of it. They thus claim that they had every right to agree amongst themselves to disavow their former contract. Grondin, on the other hand, claims that even if she is not a party to the agreement, she is a third party beneficiary.

Under New York law,[5] a third party beneficiary may sue to enforce a contract if she is an intended and not merely an incidental beneficiary. *Port Chester Electric Construction Co. v. Atlas,* 40 N.Y.2d 652, 357 N.E.2d 983, 389 N.Y.S.2d 327 (1976). Thus, an intent to benefit the plaintiff must be proven. *Id.* To this end, the plaintiff must prove that "the covenant in issue 'must have been entered into for [its] benefit, *or at least [that] such benefit must be the direct result of performance and so within the contemplation of the parties.*'" *Goodman–Marks Associates v. Westbury Post Associates,* 70 A.D.2d 145, 420 N.Y.S.2d 26, 28 (2d Dep't 1979) (quoting *Durnherr v. Rau,* 135 N.Y. 219, 222, 32 N.E. 49, 50) (emphasis and bracketed material in *Goodman*).

In this case, the individual defendants displayed an intent to benefit Grondin—or at least to benefit the memory and/or the estate of Ronnie for whom Grondin acted as personal representative. First, the agreement, although denying the right to use the name Lynyrd Skynyrd from that point forward, permitted use of the name

---

**5.** New York law governs the written agreement as it is a stated modification of the September 1975 shareholders agreement, the latter containing a choice of New York law clause.

when Ronnie was part of the product. The agreement states:

Nothing hereunder shall restrict the use of such name and associated logos, trade or service marks with respect to activities which we have heretofore undertaken together with Ronnie Van–Zant (sic) as Lynyrd Skynyrd.

Thus, the individual defendants through this agreement recognized the rights the band as a group including Ronnie held to the name Lynyrd Skynyrd—rights now represented by Grondin. There could be no other reason for using his death as a cut off-point for marketing products under the Skynyrd name.

Moreover, this agreement purports to modify the September 15, 1975 shareholders agreement to which Ronnie was a party.[6] The earlier agreement contains a clause entitled "Assignment." September 15, 1975 Shareholders Agreement § 9(c). That clause states:

This Agreement shall not be assignable but shall be binding upon and inure to the benefit of the successors and assigns of the Corporation and the respective heirs and legal representatives of the stockholders.

It is difficult to imagine how the agreement on its face could more clearly state a purpose to benefit Grondin as heir and legal representative of Ronnie, a shareholder.[7]

■ Grondin can make out no colorable contract claim against MCA however. MCA was not a party to the non-use agreement. Moreover, Grondin authorized Tribute to make arrangements for the production of an album from the 1987 tour by signing the Tribute Agreement. Her only complaint about the album is its title and

its reference to the band performing on it as Lynyrd Skynyrd. She has no quarrel with the marketing of the album under a different name. However, MCA was authorized to use the Live title by Tribute, and the artwork for the jacket was also approved by that organization. Since MCA was acting pursuant to the orders of an organization with apparent authority to approve Live, and since it was not in contractual with Grondin, it cannot be held accountable to her for breach of the non-use agreement.

Thus, Grondin has not shown a likelihood of success on the merits on this claim as against MCA. Nor has she set forth sufficient questions going to the merits to make them a fair ground for litigation.

*The Lanham Act*

Section 43(a) of the Lanham Act, 15 U.S. C. § 1125(a) provides that:

[a]ny person who shall affix, apply, or annex, or use in connection with any goods or services ... a false designation of origin, or any false description or representation, including words or other symbols tending falsely to describe or represent the same, and shall cause such goods or services to enter into commerce ... shall be liable to a civil action ... by any person who believes that he is or is likely to be damaged by the use of any such false description or representation.

Grondin asserts that by touring under the name Lynyrd Skynyrd, the individual defendants are in violation of the Lanham Act, and that by marketing the Live album, all the defendants are in violation of this provision.

■ The Lanham Act protects names of popular musical recording groups even

---

**6.** The defendants make much of the fact that the shareholders agreement gives right to hold the mark to LSPI as opposed to the individual defendants and thus contend that the individuals could not agree to forbid use of the name even if they wanted to. However, the March 14 agreement is a modification of a shareholders agreement on behalf of a corporation and not a mere contract between individuals.

**7.** Grondin, in fact, should have been included as a party to this agreement as the representative of Ronnie's shares, since he had signed the

September 1975 agreement this document purported to modify. Although the September 15, 1975 shareholder's agreement provides for an option on the part of the corporation to repurchase shares of a deceased shareholder from that shareholder's personal representative, and if the option is not exercised states that surviving shareholders shall purchase the shares, neither option was exercised and Grondin was permitted to retain control of Ronnie's shares and to participate in the governance of the corporation until her disenfranchisement in April 1988.

though that name is not a registered trademark. *See Kingsmen v. K–Tel International, Ltd.*, 557 F.Supp. 178 (S.D.N.Y. 1983); *Rare Earth, Inc. v. Hoorelbeke*, 401 F.Supp. 26 (S.D.N.Y.1975). The Act "provides relief against the type of unfair competition analogous to the misappropriation of trade names ... [and] protects against the use of a false description or designation of origin." *Kingsmen, supra*, 557 F.Supp. at 181 (citations omitted). Thus, Grondin's claim against use of the name Lynyrd Skynyrd is properly brought pursuant to the Lanham Act.

■ The question to be addressed when seeking equitable relief under the Lanham Act is whether consumers are likely to be confused as to the source or sponsorship of the product in question. *See Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinema, Ltd.*, 604 F.2d 200, 204–05 (2d Cir. 1979); *Kingsmen, supra*, 557 F.Supp. at 181; *CBS Inc. v. Springboard International Records*, 429 F.Supp. 563, 567 (S.D. N.Y.1976). Actual confusion need only be proven in an action for damages. *Warner Brothers, Inc. v. Gay Toys, Inc.*, 658 F.2d 76, 79 (2d Cir.1981).

Grondin's Lanham Act claim as it pertains to the tour is not as strong as her contract claim. She claims that there is a likelihood that by holding themselves out to be Lynyrd Skynyrd, the defendants will deceive the concert going public into believing that they are buying tickets for the group that achieved popularity a decade ago, even though the band's lead singer and main attraction is dead. In making this assertion, she relies primarily on two cases from this district, *Kingsmen, supra*, and *Springboard, supra*.

*Kingsmen* centered around a musical group that achieved popularity in the 1960's with the song "Louie, Louie." Jack Ely was the lead singer on the recording of that song, but left the band before it became popular on the record charts. After that song became a hit, the band continued to perform and record as the Kingsmen, however Ely was not part of the group. Years later, Ely was contacted to perform "Louie, Louie" for a record put out by the defendants entitled "60's Dance Party." The album listed the title of the song with the artist billed as "The Kingsmen." Additionally, the album bore the legend "These selections are re-recordings by the original artists." The court held that there was a likelihood of confusion as this was not a recording by the Kingsmen, a group that continued to exist, perform and sell albums after the departure of Ely.

*Springboard* involved recordings by different artists. In one case, the performer Charlie Rich, who early in his career had been associated with the defendants, achieved popularity while under contract to CBS Inc. After Rich became popular and was no longer involved with the defendant, the defendant produced an album of early Rich songs and marketed it with a photograph of Rich as he looked not at the time the early material was recorded but at the time of the record's production. Similarly, the band LaBelle, which had formerly been known as Patti LaBelle and the Bluebelles but had drastically changed their image and style, sued to prevent the defendant from marketing an album of Bluebelle songs bearing a recent photograph of that group. The court in the Rich case held that the record buying public was likely to be deceived by the picture on the album cover, because while it would see a picture of the old Rich, it would be buying a substantially different product. The court found the defendant's actions regarding LaBelle even more egregious since the Patti LaBelle and the Bluebelles and LaBelle were vastly different bands selling vastly different products. Injunctions thus issued in both cases.

■ Although these cases may be persuasive in the context of the Live album, which will be discussed below, they are not so compelling with regard to the concerts in issue here. First the October 1977 tragedy was highly publicized. Both parties submitted numerous news articles reporting the crash of Lynyrd Skynyrd and the deaths of Ronnie, Gaines and the others. The fact that the death of Ronnie has received much attention in the media is not contested. Thus, although possible, it is

improbable that sophisticated fans of the original Lynyrd Skynyrd will be led to believe that the 87–88 Skynyrd included Ronnie Van Zant by virtue of the use of the name Lynyrd Skynyrd. Consumers here are thus unlike consumers in the *Kingsmen* case, a case where the individual performers did not achieve attention or prominence. Additionally, unlike *Springboard*, promotional advertising for the tour does not present old photographs of the band[8] but bills the concerts as a tribute to Lynyrd Skynyrd and to those who perished in the crash.[9]

■ Nonetheless, there are minor ways in which this tour might deceive the unsophisticated concert goer. For example, there is promotional material that uses a logo similar to that displayed on an older album featuring Ronnie. However, the logo also sets forth the names of the members of the new band. Additionally, potential consumers may hear of the tour without hearing promotional advertising pertaining to the tribute and thus think they will hear the same band that recorded the previously released songs. Thus, Grondin has presented sufficiently serious questions going to the merits to present a fair ground for litigation.[10]

However, the balance of hardships tips in favor of the individual defendants on this score. The 1988 tour has not only already been scheduled, but it is already underway. Tickets have been sold. The expense to defendants to undo what has been and is being done weighs in their favor. Thus,

the tour will not be enjoined on Lanham Act grounds.

■ Similarly, the tour will not be enjoined based on the contract rights set forth above. The 1987 and 1988 tours are substantially similar in format in that the new band, calling itself Lynyrd Skynyrd, conducts a tribute to the original band while performing the original selections. However, Grondin did not object to the 1987 tour. In fact, she received a percentage of the merchandising profits from those concerts. She did not object until the 1988 tour was about to get underway. She now objects to both tours. While she is not guilty of laches and thus may ultimately prevail after a trial and be granted a permanent injunction, her delay in seeking relief indicates "an absence of the kind of irreparable harm required to support a preliminary injunction." *Citibank, N.A. v. Citytrust,* 756 F.2d 273, 275 (2d Cir.1985).

■ Likelihood of confusion is greater with respect to the album. While seasoned concert goers are unlikely to believe Ronnie Van Zant has risen from the grave to perform on tour, they have no way of knowing whether a record company has decided to release recordings of his live performances recorded before his death. This is especially so in light of the fact that Lynyrd Skynyrd albums were continually released after 1977. The prominent logo on the album jacket, as described above, is the wording "Lynyrd Skynyrd Live." The words "Lynyrd Skynyrd Tribute Tour 1987" are so small in comparison as to be nearly meaningless.

---

**8.** Programs available for purchase at the concert do contain photographs of the original Lynyrd Skynyrd. However, the program contains a history of the band as well as photographs entitled "Then & Now."

**9.** Contrary to the defendant's assertion, the fact that Lacy Van Zant, Ronnie and Johnny's father, introduces the band and introduces himself as the father of the Van Zants, does not alleviate the likelihood of confusion. Nor does Johnny's introduction of the song "Free Bird," during which he states that "no one can sing this song like my brother Ronnie" and in which he dedicates the number to the memory of those who died, cure the problem. Ignoring the fact that Lacy's acknowledgment of paternity does

not reveal that one son is dead, a statement captured on Live as well, a concert goer would have had to spend his money on a ticket before he would hear any of these proclamations.

**10.** This is especially so in light of the fact that tours under consideration in this opinion are the tribute tours only, where the new band performs old Lynyrd Skynyrd material and promotes itself as honoring the dead. The results might change if the band continued to perform as Lynyrd Skynyrd without holding itself out to be in tribute Ronnie and the others. The court is particularly mindful of this in light of recently proposed changes to the Lanham Act that would increase protection under its auspices. *See* N.Y.L.J., May 27, 1988, at 3.

First, the small lettering does not adequately explain that the record in the jacket does not contain recordings of the original group packaged in a 1987 context, or in addition to 1987 recordings. This is especially deceiving to those who are not familiar with the existence of the 1987 tour and who think Lynyrd Skynyrd has not performed live since 1977, even though records have been released since then. Nothing on the jacket cover dispels that confusion. The back of the jacket sheds no light and only lists some, but not all, solo performers on some selections. It is only after one purchases the album and removes its plastic wrapper that the dedication to the victims of the crash is revealed—and then in type size barely visible without eye strain.

Moreover, the small gold lettering appears at the very bottom of the jacket face. Thus, when the album is on display in those record stores in which records appear behind a low barrier that keeps the record in place, the small lettering is not visible at all.[11] This situation is at least as compelling as the LaBelle case set forth above. In that case there was a notation on the album cover setting forth that these were "LaBelle and the Bluebelles Early Hits."[12] However, other things about the cover, mainly the photograph, rendered the album deceptive thus warranting a grant of injunctive relief.

In sum, Grondin has set forth a colorable claim under the Lanham Act with respect to the Live album by showing a likelihood of confusion.[13] Although she has not presented evidence of actual confusion thus showing a likelihood of success on the merits, she has presented sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping in her favor.

Grondin did not delay in objecting to the distribution of Live in its present jacket. She first saw the offending jacket in March 1988, and she filed this action in May. The Live album could, as is discussed above, cause confusion among consumers. "A record album's cover ... is one of the primary means of advertisement for a record album, particularly when, in the normal retail situation, 'a customer has no way of hearing the record prior to purchase.'" *PPX Enterprises, Inc. v. Audiofidelity Enterprises, Inc.*, 818 F.2d 266, 272 (2d Cir.1987) (quoting *CBS, Inc. v. Gusto Records, Inc.*, 403 F.Supp. 447, 449 (M.D. Tenn.1974)). Since a consumer could see Live in a record store and think he was purchasing a compilation of live performances of the original Lynyrd Skynyrd, and since this could decrease sales of previously released albums unquantifiably,[14] Grondin is entitled to injunctive relief.

The balance of hardship tips decidedly in Grondin's favor because the relief granted will be limited in scope thus reducing any hardship MCA might suffer. MCA will not be required to recall all records currently in the marketplace. Additionally, MCA may utilize the jackets already manufactured. Grondin approved the release of a recording of the 1987 tour and thus must have expected that some fans of the original Lynyrd Skynyrd would purchase the Live album. Moreover, MCA has produced this jacket at great expense. Thus, relief will be more narrowly tailored to fit the exigencies of the situation. *See Spring Mills v. Ultracashmere House, Ltd.*, 724 F.2d 352

---

**11.** The compact disc version is contained in similar packaging, except that there appears thereon a picture of some, but not all, members of the new band along with guest performers.

**12.** The band was originally called Patti LaBelle and the Bluebelles where as the new band was simply LaBelle.

**13.** Grondin has additionally claimed dilution under New York General Business Law § 368-d. That section is intended to protect against public confusion caused by "dissimilar products or services which feed[ ] upon the

business reputation of an established distinctive trademark or name." *Allied Maintenance Corp. v. Allied Mechanical Trades, Inc.*, 42 N.Y.2d 538, 369 N.E.2d 1162, 399 N.Y.S.2d 628, 632 (1977). Grondin has presented no evidence in this hearing regarding the type of evil this law was intended to prevent and thus no relief will be granted pursuant to it.

**14.** In fact, Lynyrd Skynyrd produced a live album in 1976 entitled "One More From the Road." That album is still available in record stores.

(2d Cir.1983). MCA will be required to affix, or have affixed to the jacket a label explicitly conveying that this is a recording of the new band recorded in 1987 and not the original Lynyrd Skynyrd. *See Springboard, supra,* 429 F.Supp. at 569 (granting similar relief). The exact wording of the label should be mutually agreeable to the parties; however, the court will intervene if the parties are unable to agree.

*Conclusion*

In sum, Grondin's motion for a preliminary injunction pursuant to Rule 65, Fed.R. Civ.P. is denied with respect to the tour and the individual defendants but is granted insofar as MCA will be required to affix to all Live albums a sticker representing the album as a recently recorded performance of the new band. An early trial date will be set. Settle order on notice.

IT IS SO ORDERED.