17-2849-cv
Ronnie Van Zant, Inc. v. Artimus Pyle

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

August Term 2017

Argued: May 10, 2018                    Decided: October 10, 2018

Docket No. 17-2849

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

RONNIE VAN ZANT, INC., GARY R. ROSSINGTON,
JOHNNY VAN ZANT, BARBARA HOUSTON, as the
Trustee of the Allen Collins Trust, ALICIA RAPP, as
the Personal Representative of the Estate of Steven
Gaines, CORINNA GAINES BIEMILLER, as the
Personal Representative of the Estate of Steven
Gaines,

        Plaintiffs – Appellees,

                        v.

CLEOPATRA RECORDS, INC, CLEOPATRA FILMS,
a division of Cleopatra Records, Inc,

        Defendants – Appellants,[1]

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Before: NEWMAN, HALL, and CARNEY, Circuit Judges.

---

[1] The Clerk is requested to change the official caption as above.

1

Appeal from the September 13, 2017, judgment and permanent injunction of the District Court for the Southern District of New York (Robert W. Sweet, District Judge), enjoining the release of a movie for alleged violation of a consent decree settling a suit between private parties.

Judgment reversed and injunction vacated because the terms of the consent decree, which were implemented by the District Court's injunction, are inconsistent, or at least insufficiently precise, to support the injunction. Judge Newman, with whom Judge Hall joins, concurs with a separate opinion.

Evan M. Mandel, (Rishi Bhandari, on the brief), Mandel Bhandari LLP, New York, NY, for Defendants-Appellants Cleopatra Records, Inc. and Cleopatra Films.

Richard G. Haddad, (Sandor Frankel, Pauline McTernan, on the brief), Otterbourg P.C., New York, NY, for Plaintiffs-Appellees Ronnie Van Zant, Inc., Gary R. Rossington, Johnny Van Zant, Barbara Houston, Alicia Rapp, and Corinna Gaines Biemiller.

(Nathan Siegel, L. Danielle Toaltoan, Davis Wright Tremaine LLP, New York, NY, for amici curiae A&E Television Networks, LLC, Home Box Office, Inc., Metro-Goldwyn-Mayer Studios Inc., NBCUniversal Media, LLC, Paramount Pictures Corporation, Sony

Pictures Entertainment Inc., Twentieth Century Fox Film Corporation, Univision Communications Inc., and Warner Bros. Entertainment Inc., in support of Defendants-Appellants.)

(Bruce D. Brown, Gregg P. Leslie, Caitlin Vogus, The Reporters Committee for Freedom of the Press, Washington, D.C., for amici curiae The Reporters Committee for Freedom of the Press, American Society of News Editors, The Associated Press Media Editors, Association of Alternative Newsmedia, The Association of American Publishers, Inc., Discovery Communications LLC, Dow Jones & Company, Inc., First Amendment Coalition, First Look Media Works, Inc., The International Documentary Association, The Investigative Reporting Workshop, MPA – The Association of Magazine Media, National Press Photographers Association, and The Tully Center for Free Speech, in support of Defendants-Appellants.)

PER CURIAM:

This appeal presents the issue of whether the release of a movie will violate the provisions of a consent order that settled a lawsuit between private parties. This issue arises on an appeal by Defendants-Appellants Cleopatra Records, Inc. and Cleopatra Films (together, "Cleopatra") from the September 13, 2017,

judgment and permanent injunction of the District Court for the Southern District of New York (Robert W. Sweet, District Judge). *See Van Zant, Inc. v. Pyle*, 270 F. Supp. 3d 656 (S.D.N.Y. 2017). The consent order settled a suit brought in 1988 by Judith Van Zant Jenness ("Judith"), then known as Judith Van Zant Grondin, against past and then present members of the rock band known as Lynyrd Skynyrd. *See Grondin v. Rossington*, 690 F. Supp. 200 (S.D.N.Y. 1988). The 1988 suit sought to clarify each party's rights with respect to use of the name "Lynyrd Skynyrd" and their rights, among other things, to make films about the band and their own lives.

We conclude that the terms of the Consent Order are inconsistent, or at least insufficiently precise, to support an injunction, and we therefore reverse the judgment of the District Court and vacate the injunction.

Background

*The Lynyrd Skynyrd band*. Lynyrd Skynyrd was a rock band founded in the 1960s by Ronnie Van Zant ("Ronnie"), Gary R. Rossington, and Allen Collins. "The name Lynyrd Skynyrd was chosen as a spoof on the name of their high school gym teacher and is pronounced [as if it were spelled] Leonard Skinnerd." *Grondin v. Rossington*, 690 F. Supp. 200, 202 (S.D.N.Y. 1988). Artimus Pyle, an individual

critical to the issues in the pending appeal, joined the band as a drummer in 1975. Ronnie led the band, was lead singer, and wrote 50 percent of the songs. On October 20, 1977, an airplane carrying the band members crashed in Mississippi. Ronnie, Steven Gaines, Gaines' sister, and several others died. Pyle, Rossington, and Collins survived.

After the plane crash, Judith, Ronnie's widow, Rossington, and Collins entered into what they called a "blood oath" (the "Oath"), promising "never to use the name Lynyrd Skynyrd again." *See Grondin*, 690 F. Supp. at 202. The Oath was respected for 10 years.

In 1987, the surviving band members embarked on a tribute tour to Lynyrd Skynyrd. Judith took issue with their use of the band's name and sued them in the Southern District. This was the *Grondin* case, which ended with the Consent Order at issue on this appeal.

*The Consent Order*. The Consent Order restricts how the parties to the *Grondin* lawsuit, including Pyle, can use, among other things, the name Lynyrd Skynyrd, biographical material of Van Zant, and the history of the Lynyrd Skynyrd band, but permits the parties, among other things, to exploit their life stories and portray their experiences with the band in movies. We set forth below

and analyze the key language of the parties' settlement agreement, which was so-ordered by the District Court and became the Consent Order we consider here as the basis for the District Court's injunction.

*The film.* Cleopatra Records, Inc., founded and co-owned by Brian Perera ("Perera"), is a Los Angeles-based independent recording label. Sometime after its formation, Cleopatra Records entered the film business. In early 2016 Perera decided to make a film about Lynyrd Skynyrd and the 1977 plane crash (the "Film"). Ultimately, Pyle signed a contract with Cleopatra Records, Inc., in which he and Cleopatra Records agreed to the following:

- Pyle would be entitled to 5 percent of the Film's net receipts;

- The Film would be "based on the story of Lynyrd Skynyrd's 1977 plane crash and the events surrounding it" and would be "told through the recollections and life experiences of" Pyle;

- Pyle would narrate the Film, participate in on-camera interviews for the Film's bonus materials, contribute an original song to the Film's score, and have a cameo appearance in the Film; and

- Pyle would receive a "Consultant" or "Co-Producer" credit in the Film.

Joint App'x 2332-33.

*Plaintiffs' cease and desist letter.* In July 2016, after learning of the Film from press releases, the Plaintiffs sent a cease and desist letter informing Cleopatra that it was "not authorized to make a film which either purports to be or is about the

history of the Band, in whole or in part [and] not authorized to use the name, likeness, portrait, picture or biographical material of Rossington, Van Zant or Gaines in any manner." Joint App'x 2164. The Plaintiffs requested a copy of the script and said that if it proved to be the life story of Pyle and was "in no way a history of the Band," they might reevaluate their position. *Id.*

Cleopatra responded by requesting a copy of the Consent Order and asserting that it was not subject to any agreement with Plaintiffs and that it had "a First Amendment right to produce and distribute a dramatic film depicting, describing, and/or based upon true, historical events, as it sees fit." *Id.* at 2424. In the month following its response, Cleopatra also inquired of Judith whether she had any interest in participating in the Film, but that inquiry petered out without a firm reply.

*The Film's final script.* The District Court observed that the "Film's final script focuses principally on Pyle, his relationship with the Lynyrd Skynyrd band members, particularly Van Zant, and events during and immediately following the 1977 plane crash." SPA 17. It noted that the script included scenes of the band performing at a concert, scenes of the band "cavorting," flashbacks of when Pyle met and joined the band, and scenes preceding, during, and subsequent to the

plane crash. Pyle himself described the Film as "a compression of – of our life as a band." SPA 17. He also described it as "MY story – [the Film] is not just about the plane crash but also about my personal relationship with the genius that was Ronnie Van Zant, whom I loved like a brother and still miss to this day." Joint App'x 2341.

Ultimately, the District Court found that the Film is a "film about Lynyrd Skynyrd," and based its finding on the following: the script; the factual information provided by Pyle; the draft titles for the Film that all "evoke[d] the Lynyrd Skynyrd legacy," and the Court's finding that Perera was an unreliable witness who appeared to be attempting to evade rather than abide by the Consent Order. *Van Zant*, 270 F. Supp. 3d at 667.

*The Plaintiffs' lawsuit.* In April 2017, the Plaintiffs averred, they learned from a news article that Cleopatra had gone forward with the Film, titled "Street Survivors: The True Story of the Lynyrd Skynyrd Plane Crash."[2] *Id*. Filming had begun that month, and principal photography was completed in mid-May 2017. The Plaintiffs initiated the instant action on May 5, 2017. By that date, Cleopatra had spent approximately $1.2 million on the Film.

---

[2] "Street Survivors" is the name of a Lynyrd Skynyrd album.

8

On August 23, 2017, the District Court ruled that the Plaintiffs were entitled to a permanent injunction prohibiting distribution of the Film and other related activities. It reasoned that because (1) Pyle, as a signatory to the Consent Order, was bound by its restrictions; (2) Cleopatra was likewise bound by the Consent Order, despite being a non-signatory, because it had acted "in concert or participation" with Pyle to produce the Film; and (3) the Film violated the Consent Order. *Van Zant*, 270 F. Supp. 3d at 672-76. The District Court dismissed the Plaintiffs' request for a permanent injunction against Pyle individually because he had no possession of or legal rights to the Film.[3] Finally, the District Court found that the Plaintiffs were entitled to reasonable attorneys' fees.

The District Court entered the injunction against Cleopatra and others on September 13, 2017, and awarded judgment to the Plaintiffs against Cleopatra and Pyle, jointly and severally, for attorneys' fees and costs in the amount of $632,110.91 plus any additional fees and costs incurred after July 31, 2017, but not yet billed.

Discussion

---

[3] By the time of the District Court's August ruling, Pyle had relinquished his rights to a percentage of the Film's revenues.

The Defendants, Appellants here, supported by several journalism and entertainment organizations, see this case as a classic First Amendment violation involving an unlawful prior restraint. It is not. No government entity has obtained a court order to prevent the making or release of the Film, as occurred in *Joseph Burstyn, Inc. v. Wilson*, 343 U.S. 495 (1952), nor does this case involve a claim of defamation or invasion of privacy as to which the First Amendment imposes special requirements, *see New York Times Co. v. Sullivan*, 376 U.S. 254, 279-80 (1964) (First Amendment requires actual malice standard to be applied to public official's libel claim); *Meeropol v. Nizer*, 560 F.2d 1061, 1066 (2d Cir. 1977) (First Amendment requires reckless-disregard-of-truth standard to be applied to public figure's invasion of privacy claim). Nevertheless, this case implicates free speech concerns, and two circumstances counsel caution in permitting an expressive work to be enjoined, at least outside the context of copyright law where "copyright's built-in free speech safeguards are generally adequate to address" First Amendment concerns. *See Eldred v. Ashcroft*, 537 U.S. 186, 221 (2003).

First, even though the injunction here has allegedly been imposed as a result of private contract rather than government censorship, it nonetheless restrains the viewing of an expressive work prior to its public availability, and courts should

always be hesitant to approve such an injunction. "Any prior restraint on expression comes to [the Supreme] Court with a heavy presumption against its constitutional validity." *Organization for a Better Austin v. Keefe*, 402 U.S. 415, 419 (1971) (internal citations and quotation marks omitted); *see* Melville Nimmer, Nimmer on Freedom of Speech § 4.03, p. 4-14 (1984) ("[P]ermanent injunctions . . . are classic examples of prior restraints.").

Second, although parties are free to limit by contract publication rights otherwise available, *see Democratic National Committee v. Republican National Committee*, 673 F.3d 192, 204-07 (3d Cir. 2012); *Erie Telecommunications, Inc. v. City of Erie, Pa.*, 853 F.2d 1084, 1096 (3d Cir. 1988), the injunction in this case restricts the actions of an entity that was not a party to the contract that is alleged to be the source of the restriction. Cleopatra did not sign the Consent Order. The Order was sealed when entered, although Cleopatra became aware of its existence before it had spent any significant amount of money to make the Film. The District Court applied the Consent Order to Cleopatra because of its relationship with Pyle, who was a party to the Order.

Of course, an injunction may be applied to an entity that acts "in active concert or participation" with anyone bound by the injunction, *see* Fed. R. Civ. P.

11

65(d)(2)(C), and in some circumstances the All-Writs Act, 28 U.S.C. § 1651, may be used to prevent an entity from acting to interfere with an injunction, *see Pennsylvania Bureau of Corrections v. United States Marshals Service*, 474 U.S. 34, 40 (1985); *Ass'n for Retarded Children of Connecticut, Inc. v. Thorne*, 30 F.3d 367, 369 (2d Cir. 1994).[4] However, the application of an injunction to an entity that contracts with someone arguably bound by its terms in order to prepare an expressive work such as a movie raises serious concerns not present in the typical Rule 65(d)(2)(C) situation.

These considerations oblige us to examine with care the terms of the Consent Order alleged to have been violated. The key provision is section 3, the relevant terms of which provide:

> 3. Each of the Individual Defendants . . . shall have the right to exploit his . . . own respective life story in any manner or medium, including . . . [a] motion picture[] . . . . In such connection, each of the foregoing shall have the right to refer to "Lynyrd Skynyrd" and related matters and to describe and portray his experience(s) with "Lynyrd Skynyrd;" provided that no such exploitation of life story rights is authorized which purports to be a history of the "Lynyrd Skynyrd" band, as opposed to the life story of the applicable individual.

Joint App'x 40-41.

---

[4] The District Court noted that "[a] court's power to enforce provisions of consent orders comes principally from the All Writs Act." *Van Zant*, 270 F. Supp. 3d at 673.

Injunctions must "be specific and definite enough to apprise those within its scope of the conduct that is being proscribed." *In re Baldwin-United Corp.*, 770 F.2d 328, 339 (2d Cir. 1985) (internal citation omitted). As the Supreme Court has observed, "Since an injunctive order prohibits conduct under threat of judicial punishment, basic fairness requires that those enjoined receive explicit notice of precisely what conduct is outlawed." *Schmidt v. Lessard*, 414 U.S. 473, 476 (1974).

An initial, and ultimately dispositive, question on this appeal is whether the terms of the Consent Order, implemented by the District Court's injunction, are inconsistent, or at least insufficiently specific, and hence unenforceable because they permit what they also appear to prohibit. Pyle is permitted to make a movie that describes his experiences with Lynyrd Skynyrd and to refer to the band, but he may not make a movie that is a history of the band.

The script for the movie that Cleopatra has been enjoined from distributing illustrates the inconsistency, or at least the insufficient specificity, of the terms of the Consent Order. The script tells the story of the plane crash in which Ronnie and other members of the band were killed and from which Pyle walked away. That crash is part of the "history" of the band, but it is also an "experience" of Pyle with the band, likely his most important experience. Provisions of a consent decree

13

that both prohibit a movie about such a history and also permit a movie about such an experience are sufficiently inconsistent, or at least insufficiently specific, to support an injunction.

We recognize that sections 4 and 5 impose restrictions in addition to those imposed by section 3. Echoing the proviso of section 3, section 4 prohibits "exploitation in whole or in part of the history of the Lynyrd Skynyrd band without the prior written approval of Rossington, Collins and [Ronnie's] Estate." Section 5 prohibits "use of the name, likeness, portrait, picture, or biographical material" of Ronnie or Gaines with certain exceptions. These provisions may well impose restrictions on activities other than those explicitly permitted by section 3, but they cannot be interpreted to prohibit what section 3 explicitly permits.

## Conclusion

The judgment of the District Court is reversed, and the injunction is vacated. Reversal of the judgment necessarily vacates the award of attorney's fees.

JON O. NEWMAN, Circuit Judge, with whom PETER W. HALL, Circuit Judge,

joins, concurring:

I join the Court's opinion holding that the provisions of the Consent Order

on which the District Court's injunction is based are inconsistent, or at least

insufficiently precise, to support an injunction. I write separately to explain why I

believe the injunction must be vacated for the additional reason that the script for

the movie in question reveals that the movie would not exceed the authority that

the consent decree explicitly gives to Artimus Pyle and therefore to Cleopatra.

Section 3 of the Consent Order provides:

> "Each of the Individual Defendants . . . shall have the right to
> exploit his . . . own respective life story in any manner or medium,
> including . . . [a] motion picture[] [and] shall have the right to refer to
> "Lynyrd Skynyrd" and related matters and *to describe and portray his
> experience(s) with "Lynyrd Skynyrd;"* provided that no such
> exploitation of life story rights is authorized which purports to be a
> *history* of the "Lynyrd Skynyrd" band, as opposed to the life story of
> the applicable individual."

Joint App'x 40-41 (emphases added).

After examining a script for the movie,[1] I believe that the movie will "describe and portray" a major "experience" that Pyle had with the band—the events before, during, and after the plane crash that killed members of the band and from which Pyle emerged alive—and that the movie will not be a "history" of the band. The Supreme Court has noted that "where a speech case has . . . been tried in a federal court, . . . we are obliged to make a fresh examination of crucial facts." *Hurley v. Irish-American Gay, Lesbian & Bisexual Group of Boston*, 515 U.S. 557, 567 (1995).

Plaintiffs' exhibit No. 13 is a script of 108 pages. A page-by-page analysis of this script is set forth in the margin.[2] This analysis reveals that six pages (2-4, 7-8,

---

[1]The parties did not place in the record any version of the movie itself. The parties agreed at oral argument that there are no significant differences among the various versions of the script.

[2] 1: Pyle (referred to as "Artimus," his first name) says, "[T]his is my story."
2-4: Scene of band playing.
5: Band playing, focusing on Pyle.
6. Same scene, with Pyle leaving the stage and breaking up a fight.
7-8: Same scene plus green room.
9 (1st half): Green room, focusing on Pyle.
9 (2d half)-10: On a staircase, Pyle encounters a drunk fan.
11 (1st half): Pyle breaks up a fight.
11 (2d half)-19 (1st half): Hotel room, band members, focusing on Pyle and Ronnie.
19 (2d half)-20: Pyle's hotel room.
20 (bottom of page)-21 (first half): Columbia records phone call re chartering a plane.
21 (2d half)-22: Tarmac, Pyle and others see a plane coming in.
23-30 (1st half): Cabin and cockpit of plane, with band members, including Pyle; plane lands.
30 (2d half)-32 (1st half): Tarmac, phone call about the plane.
32 (2d half)-35 (1st half): Flashback to hotel room, band members welcome Pyle.

72 (2d half-73 (1st half)) show the band without focusing on Pyle, four pages (5, 9, 11, and 32) show the band but focusing on Pyle, and ninety-eight pages portray experiences from Pyle's life including his hiring by the band, his interactions with

35 (2d half)-36 (1st half): Pyle's house, Pyle and his wife.

36 (2d half)-38 (1st half): Flashback to Pyle's house where he receives a phone call offering him a tryout with the band.

38 (2d half)-39: Ballroom where Pyle is playing when he gets a phone call hiring him.

40-42 (1st half): Flashback to Pyle driving to meet the band, returning to pick up his drums, arriving at ballroom.

42 (2d half)-46 (1st half): Interior and exterior of Pyle's house, interior of Pyle's car including conversation about reentering the plane.

46 (2d half)-47 (1st half): Exterior of highway, tarmac, jeep.

47 (2d half)-72 (1st half): Tarmac, interior of plane, including cockpit, with Pyle advising pilots and passengers as plane encounters trouble.

72 (2d half)-73 (1st half): Montage of band members seeing brief scenes of their lives flash before their eyes.

73 (2d half)-75 (1st half): Plane crashes.

75 (2d half)-86 (1st half): Pyle leaving the crashed plane, helping someone off the plane, and walking through woods.

86 (2d half)-87 (1st half): Pyle encounters a man, Mote, who, apparently fearing an intruder at nighttime, fires his shotgun at Pyle, wounding him.

87 (2d half)-88 (1st half): Mote's farm, Pyle calling his wife.

88 (2d half)-93 (1st half): Outside Mote's farm where Pyle is rescued.

93 (2d half)-95 (1st half): Magnolia Hospital where Pyle is treated.

95 (2d half): Brief flashback sequence inside plane as plane crashes.

95 (bottom)-97 (1st half): Magnolia Hospital, focus on Pyle.

97 (2d half)-100 (1st half): Henry Ford Hospital where Pyle visits the other plane crash survivors.

100 (2d half)-105 (1st half): Pyle returns to scene of crash and is questioned by DEA agents who suspect plane carried narcotics.

105 (2d half)-106: Magnolia Hospital, focus on Pyle.

107 (1st half): Pyle playing with his band.

107 (2d half): Pyle driving.

108: Graveyard, Pyle voiceover.

his wife, his actions in the plane just prior to the crash, the crash, his escape from the crashed plane, his being shot, his hospital treatment, his return to the crash scene, his playing with his own band, and finally his voiceover at the graveyard.

Clearly, the plane crash and Pyle's escape from it are a major experience of his life. Because the plane was carrying members of the band, two of whom were killed, it would have been impossible for Cleopatra to depict this experience <u>of Pyle's</u> without some references to the band. The script does not portray the history of the band. It portrays an experience from Pyle's life, precisely what section 3 of the Consent Order explicitly permits, and, in doing so, it refers to the band, as section 3 also explicitly permits.

Applying the standard of review appropriate for trial court findings, my analysis of the script leaves me with "'the definite and firm conviction that a mistake has been committed.'" *Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 573 (1985) (quoting *United States v. United States Gypsum Co.*, 333 U.S. 364, 395 (1948)). A rigorous application of the *Bessemer/Gypsum* standard of review is especially warranted in reviewing fact-finding underlying an injunction prohibiting distribution of a motion picture. *See Hurley*, 515 U.S. at 567.

For these reasons, I concur in the Court's opinion.